**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| COLETTE MURRAY,<br><br>Plaintiff,<br><br>Vs.<br><br>THE UNIVERSITY OF TENNESSEE AT CHATTANOOGA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. 1:26-cv-00285-TRM-MJD<br><br>JURY DEMAND |

AMENDED COMPLAINT

Plaintiff Colette Murray, through counsel, sues the University of Tennessee at Chattanooga and for her cause of action would show as follows:

1. Plaintiff Colette Murray (hereinafter referred to as "Murray") is an adult resident of Hamilton County, Tennessee, and is a native of Scotland.

2. Defendant University of Tennessee at Chattanooga ("UTC" or "Defendant") is a public university with its campus in Chattanooga, Hamilton County, Tennessee. UTC is an education program or activity receiving federal financial assistance within the meaning of Title IX, 20 U.S.C. § 1681(a).

3. This action arises from a contract of employment of Plaintiff as the head golf coach of Defendant's women's golf program in Hamilton County, Tennessee and also under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b).

5. Murray has satisfied all administrative prerequisites to suit. Murray also exhausted UTC's internal grievance procedures, as set out below.

6. Murray served as head coach of the UTC women's golf team for nearly twenty (20)

years. During her tenure the women's golf program achieved strong academic and athletic results.

7. Murray was an exempt employee with a year to year contract with memoranda on salary and additional compensation features incorporating Defendant's policies and procedures applicable to such employees. The coach of the men's team had a five-year contract. Her employment was administered on a year-to-year basis, from June to June, with golf competitions scheduled in the fall and spring of each year.

8. Throughout her employment, Murray repeatedly advocated to UTC's athletic administration for equal treatment of the women's golf program as compared to the men's golf program, including in support, facilities, scholarships, budget, and staff salaries.

9. Murray identified specific disparities between the women's and men's golf programs. The women's program's scholarship budget was being cut, the pay of Murray's assistant coach had been cut below that of the assistant coach for the men's golf team. Murray requested that the women's program be provided six (6) full scholarships, that they not take money raised from the women's home tournament, and that her assistant coach's pay be restored to a level comparable to the men's team assistant coach.

10. Murray typically raised between $15,000 and $25,000 each year on her own from supporters for the women's golf program in a special fund. She also raised $25,000 to host a tournament and obtained support to acquire a van worth in excess of $100,000 on her own with no participation of the athletic department. At the time of her termination, the funds in the special account totaled $150,000.

11. Beginning in 2024, UTC's male athletic director and assistant athletic director apparently identified the wife of the men's golf coach as a potential replacement for Murray. At the time,

the men's coach's wife had no prior head-coaching experience. The men's golf coach was hostile toward Murray, particularly regarding the disparate treatment of the women's and men's programs. The men's golf coach, as an example, posted publicly in 2026 that Plaintiff was "psychotic" and operated "an absolute dumpster fire." He also falsely stated his family had been threatened. These activities are in violation of Defendant's employee code of conduct and harassment policies.

12. In review meetings before the 2024–2025 and 2025–2026 golf seasons, the athletic director and assistant athletic director responded to Murray's requests for equal treatment of the women's program with resistance and hostility, including statements indicating irritation at her advocacy and implied threats to her job security.

13. In a July 2025 meeting, the athletic director set performance standards for the coming year, which would have ended in June 2026, including a conference championship, that had not previously been imposed on Murray, and stated that Murray would be reviewed at the end of the golf year ending in June, 2026 and that her position could be in jeopardy. In that meeting Murray again requested six (6) full scholarships, restoration of the budget cut, and restoration of her assistant coach's pay to a level comparable to the men's team assistant coach.

14. In response to Murray's requests, the assistant athletic director referenced Murray's national origin of Scotland, criticizing Murray for awarding what was characterized as too many scholarships to foreign players.

15. In April 2025, a squad player from Kentucky who had not made the travel team and was not a scholarship athlete, complained that she had not been "monitored" and injured herself in the weight room. UTC contended Plaintiff had not been forthcoming about the circumstances of the alleged injury. The player made the complaint after she had injured herself while lifting

weights, had left school, and had not returned. At such time she was scheduled to graduate in May 2025 and had not been on the travel team. Murray denies that she failed to monitor the player. In fact, the player hit her own head on a bar when she raised up after placing a water bottle on the floor and sent medical records indicating no significant injury. Murray and the assistant coach, Sarah Busey, were with the team traveling when the incident occurred. The athletic director did not raise the player's complaint with Murray in any review meeting before October 2025, although there had been a Zoom call involving university counsel.

16. On October 9, 2025, Murray was asked to attend a meeting with UTC Human Resources ("HR"). Murray was under the understanding they would discuss the Kentucky player's complaint that UTC officials had not offered support after the injury. UTC did not notify Murray, as its policies require, that the meeting was a pre-termination meeting or that it concerned her continued employment nor was Plaintiff furnished details of the player's complaint sent in writing to Defendant. The athletic director and an HR representative attended.

17. At the meeting, Murray was told that UTC had decided to terminate her employment on the stated ground that she had failed to disclose information about the player's complaint, which was false. Murray denies concealing or failing to disclose any information. HR did not explain the alleged omissions by Murray, and the player's complaint itself was not discussed in detail. Murray was not furnished with the written complaint of the Kentucky player.

18. After the October 9, 2025 meeting, Murray was not permitted to meet with her team and was denied access to her school email even though she was taking two classes at UTC. When Murray asked the athletic director about the decision, he stated that it had been made by HR.

19. The HR representative advised that the October 9 meeting would be treated as a pre-termination meeting and that Murray had until 5:00 p.m. that same day to "respond," without

explaining what a response required. That same day, UTC assembled Murray's team and introduced the wife of the men's golf coach as the new women's golf coach, which was shocking to the team she had assembled.

20. Murray objected that UTC had not followed its own disciplinary and termination procedures, which require, before a termination for cause, notice that the employee has engaged in misconduct, a determination that corrective action would be ineffective, completion of progressive discipline, and a determination that termination is in UTC's best interests. UTC provided Murray none of these before announcing her termination on October 9, 2025.

21. Murray asked UTC's Chancellor to review the termination and stated that UTC had acted in a discriminatory and retaliatory manner and had violated its own policies. The Chancellor did not respond to those objections. On November 1, 2025, the athletic director sent Murray a letter again referencing the October 9 meeting, asserting that Murray had violated UTC policy by failing to "disclose information" about the Kentucky player and that UTC had been notified of conduct detrimental to UTC after October 9, 2025, without explanation. Murray denies both assertions. The letter stated that Murray was terminated effective November 21, 2025 even though she had previously been told she was terminated as of October 9, 2025.

22. UTC paid Murray through November 2025 but provided no salary continuation through the end of the golf year in June 2026, and discontinued the tuition payments it had been making for a master's program in connection with Murray's employment.

23. Murray timely appealed the termination to UTC's Chancellor, as UTC's rules require. The Chancellor affirmed the termination in a single sentence, without analysis or findings. Murray has exhausted UTC's internal administrative remedies.

24. UTC replaced Murray with the wife of the men's golf coach, who had no prior

experience as a head coach.

25. Subsequent to these events, the Kentucky player filed a suit in the US District Court for the Eastern District of Tennessee, Case No. 1:26-CV-00048, claiming damages for her self-inflicted injury against UTC, several athletic employees, Murray, the assistant coach, Sarah Busey, and another ex-employees of UTC. Plaintiff and Busey asked UTC to provide a defense and UTC refused to do so, even though it is providing a defense to all other defendants, including another ex-employee. As a result, Murray has incurred substantial attorney fees in defending the case.

COUNT I

Retaliation in Violation of Title IX (20 U.S.C. § 1681)

26. Murray incorporates the preceding paragraphs by reference.

27. Murray engaged in activity protected by Title IX by repeatedly complaining to UTC's athletic administration that the women's golf program received unequal scholarships and staff pay as compared to the men's golf program—that is, by opposing what she reasonably believed to be sex discrimination against the women's program.

28. UTC knew of Murray's protected activity, which she voiced directly to the athletic director and assistant athletic director in review meetings before the 2024–2025 and 2025–2026 seasons and in the July 2025 meeting.

29. UTC took adverse action against Murray by announcing her termination on October 9, 2025, replacing her the same day, and terminating her effective November 21, 2025.

30. A causal connection exists between Murray's protected activity and her termination, shown by the hostility and implied threats to her job security that followed her advocacy, the close temporal proximity between her July 2025 advocacy and her October 2025 termination,

and UTC's failure to follow its own termination procedures.

31. As a direct and proximate result of UTC's retaliation, Murray has suffered lost wages and benefits, including the loss of salary continuation through June 2026 and the discontinuation of tuition payments for her master's program, together with damage to her professional reputation and impairment of her ability to obtain comparable employment.

<u>COUNT II</u>

<u>Discrimination and Hostile Work Environment in Violation of Title IX</u>

32. Murray incorporates the preceding paragraphs by reference.

33. Murray is a woman and a member of a protected class. UTC subjected Murray to less favorable terms and conditions of employment than it afforded the men's golf program, including a reduced budget, lower assistant-coach pay, and fewer scholarship resources. UTC also imposed performance standards on Murray in July 2025 that it had not previously imposed.

34. UTC terminated Murray and replaced her with a less-experienced individual, permitting a reasonable inference that UTC acted because of Murray's advocacy for the women's program.

35. The athletic director's and assistant athletic director's repeated hostility, implied threats, and disparate treatment of the women's program, culminating in Murray's abrupt removal, were sufficiently severe or pervasive to alter the conditions of Murray's employment and create a hostile work environment based on sex. This was compounded by the hostility of the men's golf coach, apparently condoned by Defendant since he is still the coach.

36. Defendant is liable for discrimination creating a hostile work environment in violation of Title IX.

37. As a direct and proximate result of UTC's discrimination, Murray has suffered damages.

<u>COUNT III</u>

Procedural Due Process Violation

38. Murray incorporates the preceding paragraphs by reference.

39. UTC acted under color of law in administering Murray's employment, conducting the October 9, 2025 meeting, terminating Murray's employment, and adjudicating her internal appeal. Murray's entitlement to employment through the applicable employment year, including through June 2026, arose from her employment agreement and UTC's applicable employment rules and procedures.

40. Murray possessed a protected property interest in her continued employment and related employment benefits through the end of the applicable employment year.

41. Before terminating Murray, UTC was required to provide the notices, information, and procedures required by its applicable disciplinary and termination policies, including HR0525 of the University of Tennessee System Policies.

42. UTC did not provide Murray notice that the October 9, 2025 meeting was a pre-termination meeting or that her continued employment was at issue. UTC did not provide sufficient details of the allegations on which it relied, did not explain the alleged omissions attributed to Murray, and did not provide a meaningful opportunity to respond before announcing that it had decided to terminate her employment.

43. UTC failed to follow its applicable disciplinary and termination procedures before announcing Murray's termination, including the procedures requiring notice of misconduct, a determination that corrective action would be ineffective, progressive discipline, and a determination that termination was in UTC's best interests.

44. By terminating Murray's employment and depriving her of salary, employment benefits, and tuition payments without the required notice and meaningful opportunity to be heard, UTC

deprived Murray of property without due process of law in violation of the Fourteenth Amendment and 42 USC § 1983.

45. As a direct and proximate result of the foregoing, Murray has suffered lost wages, lost employment benefits, lost tuition payments, damage to her professional reputation, impairment of her ability to obtain comparable employment, and other damages.

## COUNT IV

### Breach of Obligation to Indemnify

46. UTC would not confirm that it would provide counsel and indemnification to Murray in connection with the claims asserted by the former Kentucky player, which has caused Murray additional damages in violation of UTC and State policies, including the necessity of providing and paying for a defense of the assistant coach, Sarah Busey, who resigned after Murray was wrongfully terminated.

47. UTC has breached its obligation to indemnify Murray from its own fault. Such breach has caused Murray damages.

WHEREFORE, Murray prays:

(a) That Murray recover damages for back pay and be reinstated to her former position or, alternatively, that she be awarded front pay, together with additional damages for wrongful termination, retaliation, and discrimination.

(b) That Murray recover damages to her reputation arising from the false assertions concerning her job performance, damaging her job opportunities.

(c) That Murray have such other and further relief as the evidence may support, including attorney's fees and costs as well as costs of defending the Federal suit.

(d) Murray demands a jury.

Respectfully submitted,

HORTON, BALLARD & PEMERTON, PLLC

By: /s/William H. Horton

William H. Horton, BPR No. 01935
735 Broad Street, Suite 306
Chattanooga, Tennessee 37402
(423) 826-2641
whorton@hbplawfirm.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November, 2026 an exact copy of the foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

HORTON, BALLARD & PEMERTON, PLLC

By: /s/ William H. Horton